IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>vs.<br><br>GREAT SALT LAKE COUNCIL, INC., BOY SCOUTS OF AMERICA<br><br>THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, and<br><br>THE PEOA CORPORATION OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS,<br><br>Defendants. | ORDER<br>AND<br>MEMORANDUM DECISION<br><br>Case No. 2:04-CV-604 TC |

On June 28, 2002, a wildfire burned over 14,000 acres in the Uinta Mountains. The United States sued Great Salt Lake Council, Inc., Boy Scouts of America (the "Council"), alleging that the Council's negligence caused the fire. The United States is seeking damages for the restoration and rehabilitation of the burned natural resources. The Council concedes that a wildfire occurred, but it denies liability. The United States filed a Motion for Partial Summary Judgment regarding liability based on three theories: (1) respondeat superior liability for the negligent acts of the Council's employees; (2) negligence per se; and (3) statutory liability for

fire suppression costs under Utah Code Section 65A-3-4.  Because there are genuine issues of material fact regarding causation, the United States' Motion for Partial Summary Judgment is DENIED on the basis of liability under all three theories.  But the Court finds that the Council did have a legal duty as a matter of law.  The Court defers all other matters for trial.

## I. FACTUAL BACKGROUND[1]

In 2002, the Council owned and operated a Boy Scout summer camp ("Camp Tomahawk") on state land in the Uinta Mountains.  The land is referred to as the East Fork of the Bear Scout Reservation ("East Fork").  The Council hired John White as Camp Tomahawk's camp director and two fifteen-year old Boy Scouts–C.A. and P.P.–as teen counselors.

On June 21, 2002, the Utah State Forester issued a Fire Restriction Order ("Order") under Utah Code Section 65A-8-10 that included Camp Tomahawk.  The Order became effective on June 25, 2002, and prohibited the "setting, building, maintaining, attending or using open fires of any kind, except campfires built within the facilities provided for them in improved campgrounds, picnic areas, or permanently improved places of habitation."  (Stage I Fire Restriction Order, attached as Ex. B to Pl.'s Mem. in Supp. of Mot. for Partial Summ. J.) Additionally, the Council issued its own fire policy during summer 2002 that permitted fires only in one designated area per campsite.

On June 27-28, 2002, the Council offered seventeen Boy Scouts, ages twelve through fourten, the opportunity to acquire their Wilderness Survival merit badge at Camp Tomahawk.  One of the requirements to receive the merit badge was that scouts had to spend a night in an improvised shelter.  John White, C.A., and P.P. organized, conducted and supervised the

---

[1] Only the facts necessary to the court's analysis will be set forth here.

overnight stay ("Overnight"). The Council held the Overnight in an area which had been used many times before for this purpose. The area was not in an "improved campground," and the Council conceded that there were no fixed, man-made improvements in the area.

Although the Council sent the two fifteen-year old counselors to supervise the seventeen Boy Scouts, there was no adult supervision on the Overnight. Further, both teen counselors left the Overnight site to sleep in tents more than one-quarter mile away. But before the two counselors left for their tents, the younger Boy Scouts started fires that night.

One of these fires was built by Boy Scouts from Troop 149 (the "Shelter 11 Fire") inside their overnight shelter. The Boy Scouts at Shelter 11 attempted to extinguish the fire by throwing water on it from a nearby creek, urinating on it, and covering it up with dirt. Counselor C.A. watched the Boy Scouts throw dirt on the fire before leaving the Overnight site. The Council asserts that the Boy Scouts at Shelter 11 believed the fire was extinguished. The next morning, C.A. and P.P. returned to the Overnight site and stopped by Shelter 11. C.A. threw dirt on the area where the fire was built before leaving the Overnight site.

Timothy Clark, the United States' fire investigator, determined that the wildfire grew out of the Shelter 11 Fire.[2] The wildfire consumed 14,208 acres of federal, state, and private lands and cost the United States $12 million in suppression and rehabilitation efforts.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

[2] Mr. Clark gave his opinion that the East Fork Fire grew from the Shelter 11 Fire, which smoldered in the duff and surfaced after the Boy Scouts left the site of the Overnight. (Decl. of Timothy Clark ¶¶ 5-6, attached as Ex. S to Pl.'s Mem. in Supp. of Mot. for Partial Summ. J.)

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998). The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). The nonmovant must set forth "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. ANALYSIS

The United States filed a Motion for Partial Summary Judgment regarding the Council's liability based on three theories: (1) respondeat superior liability for the negligent acts of the Council's employees; (2) negligence per se; and (3) statutory liability for fire suppression costs under Utah Code Section 65A-3-4.[3]

**A.  Because Genuine Issues of Material Fact Regarding Causation Exist, Summary Judgment Regarding Liability is Denied.**

Proximate cause is "that cause which, in natural and continuous sequence, (unbroken by efficient intervening cause), produces the injury and without which the result would not have occurred." Steffensen v. Smith's Mgmt. Corp., 820 P.2d 482, 487 (Utah Ct. App. 1991), aff'd, 862 P.2d 1342 (Utah 1993).[4]  While proximate causation is generally an issue for the jury, a trial

---

[3] In the Council's Opposition Brief, it argues against any claim against the Boy Scouts of America ("BSA"), which is an entity distinct from the Great Salt Lake Council, Inc. But the United States in its Reply correctly states that the BSA is not a defendant in this lawsuit and the only named defendant is the Council.

[4] Both parties agree that the substantive law of Utah applies to the claims.

court may rule as a matter of law on the issue if "(1) there is no evidence to establish a causal connection, thus leaving causation to jury speculation, or (2) where reasonable persons could not differ on the inferences to be derived from the evidence on proximate causation." Bansasine v. Bodell, 927 P.2d 675, 676 (Utah Ct. App. 1996) (quoting Steffensen, 820 P.2d at 487.) Summary judgment should only be granted when all reasonable minds conclude that negligence exists.  Bullock v. Ungricht, 538 P.2d 190, 191 (Utah 1975)  "[I]f there is doubt about the matter, it should be resolved in favor of according the parties the right to trial by jury of those dispute issues."  Id.  Generally, "causation cannot be resolved as a matter of law."  Butterfield v. Okubo, 831 P.2d 97, 106 (Utah 1992).

The Council argues that there is evidence from the scouts that they extinguished the Shelter 11 Fire.  The Council points to a number of statements in the record that, according to the Council, supports the Council's position.

First, a young scout stated, "[we] decided we were getting tired so we had better put [the fire] out before we went to bed so it had enough time to cool off and everything.  So we peed on it and then we put some handfuls of dirt on top of it and then we pushed all of the rocks that were around it–on top of the dirt that we had put on it." (S.Q. Dep. at 18:23-19:5, attached as Ex. I to Def.'s Opp'n Mem.)  That same scout testified further regarding the issue.

> Q. When you were sleeping up here with your head near the fire, did anything bother you such as smoke smell coming from the fire when you were sleeping?
>
> A. No, not at all.  When we had pushed the dirt on it and were done with it, it was just a warmer cabin and nothing–you couldn't even really tell the fire was there other than we just didn't want to go there because there was a hole that you would be sleeping in.
>
> . . . .
>
> Q. Did you have any concern the next morning when you left that that fire that you had seen the coals go out on and peed on and put the

     dirt on was any kind of a hazard to the environment or staff?

  A.  No. Because we were pretty sure it had been out the night before because it hadn't bothered us all night and then in the morning we were in a hurry to get out of our cabin so we weren't really thinking of that.

(Id. at 18:11-20, 34:5-14.)

Second, the Council's teen-counselor, C.A., stated in his deposition that: "[w]e threw dirt on it. I had every scout throw dirt on it. We buried it and threw the rocks back into the pit." (C.A. Dep. at 27:15-18, attached as Ex. F to Def.'s Opp'n Mem.)

Third, in a statement given to a United States' Fire Investigator, another scout stated, "[he] [p]ut fire out with one bottle of water and dirt and put rocks over [it]." (L.E. Statement, attached as Ex. G to Def.'s Opp'n Mem.)

Further, two of the young scouts slept with their heads next to where the fire had been and did not notice any smoke or heat coming from the area where the fire had burned. (See Def.'s Opp'n Mem. at xi.; C.M. Dep. at 24:7-25:14, attached as Ex. K to Def.'s Opp'n Mem.)

"It is not the purpose of the summary judgment procedure to judge the credibility of the averments of parties, or witnesses, or the weight of the evidence." Draper City v. Estate of Bernardo, 888 P.2d 1097, 1101 (Utah 1995). "A single sworn statement is sufficient to create an issue of facts precluding summary judgment." Webster v. Sill, 675 P.2d 1170 (Utah 1983). Further, any "[d]oubts, uncertainties, or inferences concerning issues of fact must be construed in light most favorable to [the] party opposing summary judgment." Mountain States Tel. & Tel. Co. v. Atkin, 681 P.2d 1258, 1261 (Utah 1984). Because there exists genuine issues of material fact regarding causation, the United States summary judgment regarding liability is denied.

**B.**  **The Council Owed a Duty to the United States.**

The United States' first argument regarding liability is based on respondeat superior

liability for the negligent acts of the Council's employees, including the camp director and counselor-employees, who allowed younger scouts to build illegal campfires and failed to ensure that these campfires were properly extinguished. (Am. Compl. ¶¶ 41-46.)

### 1. Respondeat Superior

To establish an employer's liability for an employee's tortious conduct, plaintiff has to demonstrate that (1) an employer-employee relationship existed and (2) the employee was acting within the scope of his employment at the time the tort occurred. See Glover v. Boy Scouts of Am., 923 P.2d 1383. "[A]n employer is liable for his employee's negligence." Krukiewicz v. Draper, 725 P.2d 1349, 1351 (Utah 1986).

The Council admitted that John White, C.A., and P.P. acted within the scope of their employment with the Council when they "organized, conducted and supervised the overnight of the boys seeking the wilderness survival merit badge." (Def.'s Answer ¶ 20.) Because the Council concedes that an employer-employee relationship existed and the employees were acting within the scope of employment at the time the alleged tort occurred, the Council is liable for any alleged negligence of its employees regarding the Overnight.

### 2. Duty Is a Question of Law

One of the essential elements of a negligence claim is that the defendant owed the plaintiff a duty. See Webb v. Univ. of Utah, 125 P.3d 906, 909 (Utah 2005). Whether a duty of care is owed is entirely a question of law to be determined by the court. See Utah Power & Light Co. v. Fed. Ins. Co., 983 F.2d 1549, 1562 (10th Cir. 1993); Rose v. Provo City, 67 P.3d 1017, 1020 (Utah Ct. App. 2003). The existence of a duty of reasonable care depends in part on the extent to which a reasonable person can foresee that his acts may create a significant likelihood of causing harm to others. AMS Salt Indus. Inc. v. Magnesium Corp. of Am., 942 P.2d 315, 321

(Utah 1997).  Whether the law imposes a duty does not depend upon foreseeability alone.  <u>Id.</u> Other factors that must be taken into account are the likelihood of injury, the magnitude of the burden of guarding against it, the consequences of placing that burden upon the defendant, mutual reliance, voluntary conduct which increases the risk of harm, and general policy considerations.  <u>Id.</u>

The United States maintains that the Council owed the United States a duty.  The United States asserts that a reasonable person could foresee that leaving a group of young scouts alone and without adult supervision during the Overnight, knowing that they should not have had campfires but were lighting and playing with fires, and failing to ensure that these illegal fires were properly extinguished might create a significant likelihood of causing harm to others.  (Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. at page 12.)  Based on the following undisputed facts, the Court agrees.

The Council and John White failed to send an adult on the Overnight to supervise the young Boy Scouts.[5]  (Am. Compl. ¶ 24; Def.'s Answer ¶ 14.)  Further, the two teen-counselors that accompanied the younger scouts on the Overnight spent the evening a quarter of a mile away from the Overnight site, beyond visual and hearing range of the Overnight.  (Am. Compl. ¶ 27; Def's Answer ¶ 16.)  The Program Director for Camp Tomahawk admitted that "[s]omeone over 16 should be with the scouts during the overnight."  (Boyd Statement, attached as Ex. N to Pl.'s Mem. in Supp. of Mot. for Partial Summ. J.)  Also, the Program Director admitted that "C[.A.]

---

[5] A Boy Scout policy–the "Sweet 16 of BSA Safety"–requires the adult supervisor to "confirm and assure compliance with all applicable regulations or statutes." ( attached as Ex. G). The Council correctly states that the BSA policies do not create a duty.  But the Court agrees that even if BSA's policies regarding supervision of younger scouts are intended "for the well-being and safety of the children and youth," they exist precisely because there is a significant likelihood that unsupervised younger scouts will cause harm to themselves or others.

and P[.P.] should not have left the boys alone overnight." (Id.)

Indeed, the likelihood of harm from ignoring fire restrictions was not only reasonably foreseeable, it was actually foreseen by the Council. Because the Council knew that the fire danger was high, the Council implemented its own fire policy during 2002. (Jepsen Dep. at 30:25-31:3, attached as Ex. D to Pl.'s Mem. in Supp. of Mot. for Partial Summ. J.) The Council's fire policy permitted fires *only* in one designated area per campsite. (White Dep. at 51:21-53:19, attached as Ex. A to Pl.'s Mem. in Supp. of Mot. for Partial Summ. J.) The Council communicated the policy directly to John White, who communicated it to leaders, staff and Boy Scouts at Camp Tomahawk. (Id., 37:9-38:8.)

Further, the State Forester issued a Fire Restriction Order on June 25, 2002 that implemented a ban on "open fires of any kind, except campfires built within the facilities provided for them in improved campgrounds, picnic areas, or permanently improved places of habitation." (Stage I Fire Restriction Order, attached as Ex. B to Pl.'s Mem. in Supp. of Mot. for Partial Summ. J.)

The Council admitted that the Boy Scouts started two or three fires during the Overnight, which was not in an *improved* area. (Def.'s Opp'n Mem. at v.) The Council admits that C.A. and P.P. were present when some of the fires were started. (Am. Compl. ¶ 28; Def.'s Answer ¶ 17.)

The Boy Scouts of America Fieldbook contains specific instructions for ensuring that fires are extinguished properly:

> [P]ut out a fire by sprinkling it with plenty of water, stirring the embers to
> moisten them thoroughly. Don't stop until the remains of your fire pass
> the cold-out test, which means you can safely run your hand through the

> extinguished coals and ashes. After the fire is dead out, crush the ashes, mix them with the mineral soil of firelay, and return the soil to the pit from which it was borrowed.

(Boy Scouts of America Fieldbook, attached as Ex. V to Pl.'s Mem. in Supp. of Mot. for Partial Summ. J.)  The Council maintains that the Boy Scouts stated that the fire was dowsed with liquid, smothered with dirt, and the spot was almost slept on the whole night.  (See Def.'s Opp'n Mem. at vii.)  But the record fails to provide any indication that either the young scouts or the teen-counselors conducted a 'cold-out' test on the evening of the Overnight.  The Council admitted that although C.A. and P.P. returned to the site of the Shelter 11 Fire the following morning, they again did not follow the Boy Scouts Fieldbook Instructions.  (Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. at 9; Def.'s Opp'n Mem. at ii.)  Instead, C.A. threw dirt on the fire and put rocks from around the fire back into the fire pit.  (Id.)  P.P. put some dirt on the fire but "[t]he scouts [had] peed on [the fire].  So that's why I didn't dig in it."  (Id.)

For the reasons stated above, the court finds that the Council owed a duty to the United States as a matter of law.

### ORDER

The United States Motion for Partial Summary Judgment is DENIED in part and GRANTED in part.

1. Because there are genuine issues of material fact regarding causation, the Court declines to find in the United States' favor on the ultimate question of liability.

2. The Court finds that the Council did have a legal duty as a matter of law.

SO ORDERED this 22nd day of January, 2007.

                    BY THE COURT:

                    */s/ Tena Campbell*

                    TENA CAMPBELL
                    United States District Judge